KONIGSBERG INTL. INC.; the Sanitsky
Company, Plaintiffs–Appellants,

v.

Anne RICE, Defendant–Appellee
(Two Cases).

Nos. 92–55425, 93–55122.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 3, 1993.

Decided Feb. 11, 1994.

Naomi Norwood, Jerome S. Mandel, Mandel & Norwood, Santa Monica, California, for plaintiffs-appellants Konigsberg Intl. Inc. and The Sanitsky Company.

Russell J. Frackman, Mitchell, Silberberg & Knupp, Los Angeles, California, for defendant-appellee Anne Rice.

Before: BRUNETTI, KOZINSKI and BOGGS,* Circuit Judges.

* The Honorable Danny J. Boggs, United States Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

KOZINSKI, Circuit Judge:

Inside many a practicing lawyer there's a novelist struggling to be born. The converse is also true: Novelists sometimes yearn to be lawyers. All things considered, it's best if all concerned stick with their own callings.

## I

In 1987, after a lunch meeting with movie producers Frank Konigsberg and Larry Sanitsky, author Anne Rice allegedly entered into an oral agreement to sketch out a romantic melodrama involving a love triangle between a resurrected mummy, an English heiress and Queen Cleopatra. Based on this simple premise, Rice would create a "bible"—a detailed story which could form the basis for derivative works in various entertainment media. Rice would then write the novel, and Konigsberg's and Sanitsky's companies (K & S) would have two years from the date a television network officially notified them of a decision regarding a teleplay of THE MUMMY to exploit the television and movie rights, with an option to extend. K & S drafted a contract along these lines, but the parties didn't settle on final terms or sign any agreement. Rice simply delivered the bible, and the producers forked over $50,000.

In the next two years, Rice went on to write and copyright a novel called THE MUMMY. K & S failed to exploit their rights but, allegedly, tried to exercise their option to extend. They say Rice refused; she says there was never an agreement, and, even if there was, K & S failed to extend it within the option period.

Disappointed to lose rights in what turned out to be a best-seller, K & S filed a declaratory judgment action asserting co-ownership of the bible, an exclusive license[1] to the motion picture and related rights.[2] The district court dismissed K & S's complaint because the Copyright Act, 17 U.S.C. § 204(a), requires a signed, written transfer of copyright to establish co-ownership or an exclusive license. *Effects Assocs., Inc. v. Cohen* ("*Effects II*"), 908 F.2d 555, 557 (9th Cir. 1990). K & S could produce no such writing.

That might well have been the end of the story, but for the fact that Rice thereafter tried to vindicate her position by writing a somewhat indignant letter to K & S's lawyer: "[A]s far as I am concerned," she proclaimed, "these contracts, though never signed, were honored to the letter." ER 21A at 1. "They got exactly what they paid for. A bible script and the television rights to the novel, THE MUMMY for over two years." *Id.* at 2. K & S only failed, Rice claimed, "to pick up their option, or extend it." *Id.* at 1.

Not only did this letter fail to shame K & S into contrition, it gave them what they thought was the missing link to their argument—a writing signed by the author. Armed with this new evidence, K & S brought a Rule 60(b) motion and a request for leave to amend their complaint, claiming that they now had a writing sufficient to satisfy section 204 of the Copyright Act. The district court denied both motions on the ground that this was not the kind of writing that satisfies section 204(a). Though hardly Rice's intention, her advocative effort gives us an opportunity to address an interesting and difficult issue concerning the nature of the Copyright Act's written instrument requirement.

## II

■ Under section 204(a), "[a] transfer of copyright ownership ... is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." In *Effects II*, we stated that the writing must ensure that the author "will not

---

**1.** K & S also raise a claim for a nonexclusive license. Because this wasn't raised below, we won't consider it on appeal. *Greenhow v. Secretary of Health & Human Services*, 863 F.2d 633, 638–39 (9th Cir.1988).

**2.** K & S's claims for breach of fiduciary duty, accounting, constructive trust and bad faith denial of contract all turn on the existence of their copyright interest in the bible and THE MUMMY. Because of the way we resolve that issue, we need not address these related claims. *See, e.g., Valente–Kritzer Video v. Pinckney*, 881 F.2d 772, 775–76 (9th Cir.1989) (addressing bad faith denial of contract).

give away his copyright inadvertently" and "forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price." 908 F.2d at 557. The writing should also serve as a guidepost for the parties to resolve their disputes: "Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual understanding, parties need only look to the writing that sets out their respective rights." *Id.* To serve these functions, the writing in question must, at the very least, be executed more or less contemporaneously with the agreement and must be a product of the parties' negotiations.

Although section 204 is often referred to as the "copyright statute of frauds," it actually differs materially from state statutes of frauds. While the latter may be satisfied by a writing not intended as a memorandum of contract, not communicated to the other party, and even made in pleadings or testimony years after the alleged agreement, *see* Restatement (Second) of Contracts § 133 cmts. b, d (1981), section 204 may not. State statutes of frauds serve a purely evidentiary function—to prevent enforcement through fraud or perjury of fictitious agreements. *Id.* § 131 cmt. c. Thus, agreements subject to statutes of frauds may be perfectly valid, yet unenforceable without evidence of a writing.

By contrast, a transfer of copyright is simply "not valid" without a writing. 17 U.S.C. § 204(a). Section 204's writing requirement not only protects authors from fraudulent claims, but also "enhances predictability and certainty of ownership—'Congress's paramount goal' when it revised the Act in 1976." *Effects II,* 908 F.2d at 557; *see also* Jay Dratler, Jr., *Intellectual Property Law: Commercial, Creative, and Industrial Property,* § 6.03[3] at 6–72 (1993) (copyright

statute of frauds "performs not only the usual evidentiary and cautionary functions of all statutes of frauds, but also the additional purpose of describing the bounds of intangible rights that cannot be seen or felt"); *cf. Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 412 (7th Cir.1992) (section 101's requirement of a written statement for copyright ownership of works for hire "is not merely a statute of frauds"; its second purpose is "to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable.").[3]

Rice's letter was written three and a half years after the alleged oral agreement, a year and a half after its alleged term would have expired and 6 months into a contentious lawsuit. Thus, it was not substantially contemporaneous with the oral agreement. Nor was it a product of the parties' negotiations; it came far too late to provide any reference point for the parties' license disputes. In short, Rice's letter—though ill-advised—was not the type of writing contemplated by section 204 as sufficient to effect a transfer of the copyright to THE MUMMY. .

We turn therefore to K & S's alternative argument, that no transfer (and hence, no writing) was required because they had a joint venture with Rice to create the bible, which upon its creation, became the property of the joint venture. In *Effects II,* we rejected the argument that such "joint creative endeavors" can displace section 204's writing requirement. 908 F.2d at 556–57. Appellants, however, point to *Oddo v. Reis,* 743 F.2d 630, 632–33 (9th Cir.1984), for the proposition that joint venturers—who neither are co-authors nor have executed a written transfer—can still be co-owners. *Oddo* provides no support for this proposition. The parties there had formed a partnership for the very purpose of creating the book in question. In signing the *written* partnership agreement,

---

**3.** The Second Circuit has held that the note or memorandum can retroactively validate an earlier oral transfer. *Eden Toys, Inc. v. Florelee Undergarment Co.,* 697 F.2d 27, 36 (2d Cir.1982) (memorandum of transfer made within year of oral agreement and during term of exclusive license validated agreement ab initio), *cited in Valente–Kritzer Video v. Pinckney,* 881 F.2d 772, 775 (9th Cir.1989) (dicta). Given that Congress has declared oral transfers "not valid" in the absence of a writing, we have doubts about whether a later writing can validate a purported transfer that substantially predates the writing. In any case, we read the Second Circuit's rule as applying only to writings executed during the life of the purported license—not, as here, many years later.

the author transferred his copyright in the manuscript to the partnership because each partner—under state law—was co-owner of the partnership's assets. *Id.* at 632.

*Oddo* holds only that the written instrument sufficient to satisfy section 204 can also perform other functions, *e.g.*, set up a partnership. It is a far different matter to say one can dispense with the written instrument requirement altogether by claiming an oral partnership or joint venture. Given the ease with which joint ventures may be alleged and proved under the law of many states, acceptance of this argument would fatally undermine the Copyright Act's written instrument requirement. *See, e.g., Brown v. Fairbanks,* 121 Cal.App.2d 432, 263 P.2d 355 (1953) (finding partnership where plaintiff mine owners paid defendant $100 per month to dig mine shaft); *Hanlon v. Melfi,* 102 Misc.2d 170, 423 N.Y.S.2d 132 (1979) (finding joint venture where defendant trucker supplied plaintiff's business with fresh produce); *Kahle v. Turner,* 66 Ohio App.2d 49, 420 N.E.2d 127 (1979) (finding joint venture where fair sponsor allowed ferris wheel operator to run amusement on fair property and to collect profits).

In sum, Konigsberg, Sanitsky and Rice did lunch, not contracts. That didn't satisfy section 204 in *Effects II,* 908 F.2d at 556–57, and it fares no better here.

**AFFIRMED.**