**RADIO TELEVISION ESPANOLA S.A.,** a Spanish Corporation; Television Espanola S.A., a Spanish Corporation, Plaintiffs–Appellants–Cross–Appellees,

v.

**NEW WORLD ENTERTAINMENT, LTD.,** a Delaware Corporation, Defendant–Appellee– Cross–Appellant.

Nos. 97–56418, 98–55128.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 1999.

Filed July 16, 1999

John R. Hurt, Hurt, Sinisi & Papadakis, San Diego, California; David R. Shaub, Shaub & Williams, Los Angeles, California, for the plaintiffs-appellants-cross-appellees.

David Pettit, Caldwell, Leslie, Newcombe & Pettit, Los Angeles, California; George R. Hedges, Quinn, Emanuel, Urquhart, Oliver & Hedges, Los Angeles, California, for the defendant-appellee-cross-appellant.

Before: FERGUSON, BRUNETTI, and T.G. NELSON, Circuit Judges.

FERGUSON, Circuit Judge:

Radio Television Espanola sued New World Entertainment for breach of contract, claiming that New World failed to honor a contract granting Radio Television an exclusive license to broadcast two of New World's television programs. The district court granted summary judgment for New World because the parties had not complied with 17 U.S.C. § 204(a)'s requirement that transfers of copyright be in writing. On appeal, we affirm on the merits but reverse the district court's subsequent determination that New World's application for costs was untimely.

## I. BACKGROUND

New World Entertainment is an American company that produces and distributes

television programs. Television Espanola is a Spanish company owned by Radio Television Espanola, a company owned by the country of Spain. Television Espanola acquires rights to broadcast television programs for its principal, Radio Television, and then broadcasts those programs throughout Spain. New World and Television Espanola had conducted business with each other since at least 1988.

In April 1994, the two companies met at a television market in Cannes, France, where Television Espanola alleges there was an oral agreement for an exclusive license for two of New World's animated programs, Spiderman and Marvel Action Hour. After the Cannes meeting, New World informed Television Espanola that any licensing of Spiderman would have to be accompanied by deals for Marvel Action Hour and two other programs, Tales From the Crypt and The Extraordinary.

The two parties met over the issue. Television Espanola claims that the discussions culminated in a final deal licensing Spiderman and Marvel Action Hour. Following that meeting, New World's negotiating agent, Alejandro Garcia, signed two internal deal memos dated July 11, 1994, describing the terms of the alleged agreement. Both deal memos, completely internal to New World, state that the contracts were to be prepared by Television Espanola.

From that point on, many more letters, faxes, and memos changed hands. The parties sent memos discussing details concerning regional affiliates, format of the programs, price, and quantity. Not until May 26, 1995, did Television Espanola finally deliver the proposed licensing contracts to New World. New World, however, never signed the contracts.

Throughout the process of negotiating for Spiderman and Marvel Action Hour, the parties had several communications regarding the program The Extraordinary. In June 1995, New World sent Television Espanola a letter seeking further negotiations over The Extraordinary. A Television Espanola executive responded by sending a fax to New World claiming that the contracts for Spiderman and Marvel Action Hour were complete and must be followed regardless of the status of any deal for The Extraordinary. New World did not agree, and sent a letter on August 8, 1995, to Television Espanola accusing it of acting unprofessionally and stating that New World had decided "effective immediately to leave without effect all and each one of our negotiations between our companies with respect to any and all New World programming. . . ." Television Espanola responded in writing accusing New World of "blackmail" for refusing to honor its obligation on Spiderman without an agreement for The Extraordinary. At that point, the parties ended their relationship.

It is important to note what was happening at this point in time between New World and another Spanish television station, Antena 3. Since at least July 17, 1995, New World had been negotiating with that station regarding airing a package of New World shows: Spiderman and The Extraordinary. On January 24, 1996, months after the breakdown of negotiations with Television Espanola, Antena 3 and New World signed a formal licensing agreement for the broadcast of Spiderman and The Extraordinary.

As a result of the breakdown in the relationship, Television Espanola filed this suit against New World on April 19, 1996, in the Central District of California.[1] Ten days later, Television Espanola filed its first amended complaint, the complaint that forms the basis of this action. The complaint alleged breach of contract, unjust enrichment, unfair competition,[2] mon-

---

1. Subject matter jurisdiction was based on diversity of citizenship. *See* 28 U.S.C. § 1332.

2. The cause of action for unfair competition was voluntarily dismissed by Television Espanola on April 24, 1997.

ey due and owing, and declaratory relief. In its answer, New World raised 17 U.S.C. § 204(a) as an affirmative defense to all of Television Espanola's claims. New World filed a motion for summary judgment, and the district court heard arguments on the motion on August 4, 1997. The next day, August 5, the court issued a minute order granting the motion for summary judgment, finding both that there was no meeting of the minds to form a contract and that the parties had not complied with § 204(a). The minute order was entered in the civil docket on August 6, 1997. Television Espanola appealed the grant of summary judgment on September 5, 1997, and the appeal was docketed with this court on October 22, 1997.

Believing the entry of the minute order did not constitute a final judgment, New World lodged a proposed judgment with the district court on October 2, 1997. On October 6, 1997, the district court signed the judgment and entered it in the civil docket. Eleven days later, on October 17, 1997, New World filed its bill of costs pursuant to local rule. Television Espanola, believing the August 6 entry of the minute order constituted final judgment, objected to the district court's entry of a second judgment in the case. On November 25, 1997, the district court considered New World's bill of costs along with Television Espanola's objection and denied New World's application, reasoning that the August 5 minute order entered in the docket on August 6 constituted entry of final judgment; accordingly, New World was not entitled to costs because its application did not come within fifteen days of the court's entering judgment on August 6, 1997. The denial of costs was entered on December 1, 1997, and New World timely

filed an appeal. On stipulation of the parties, a Ninth Circuit mediator ordered that the two separate appeals be consolidated and briefed in cross-appeal format.

## II. DISCUSSION

### A. Breach of Contract

We review the district court's grant of summary judgment de novo. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* Under that standard, we hold that the district court was correct in concluding that New World was entitled to summary judgment because there was no writing satisfying the requirements of 17 U.S.C. § 204(a).

Our analysis begins with a look at the copyright statutes. Under United States law,[3] the owner of a copyright of "audiovisual work" has the exclusive rights to copy, distribute, or display the work publicly. 17 U.S.C. § 106. The owner can sell or license the rights to the work as long as the transfer complies with 17 U.S.C. § 204(a), which states as follows:

> A transfer of copyright ownership,[4] other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

This court has consistently found copyright license agreements invalid that have not complied with § 204(a). *See Konigsberg Int'l. Inc. v. Rice*, 16 F.3d 355, 356–57

---

**3.** Neither party disputes that United States copyright law applies to this case because, even though the alleged transactions took place in Spain, the copyrights involved are United States copyrights.

**4.** The copyright laws define a "transfer of copyright ownership" as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a

copyright or of any of the exclusive rights comprised in a copyright ... but not including a nonexclusive license." 17 U.S.C. § 101. Television Espanola claims that it was granted an exclusive license and does not claim that it has a nonexclusive license; thus, the transaction forming the basis of this lawsuit falls within the definition of "transfer of copyright ownership."

(9th Cir.1994); *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 556–58 (9th Cir.1990); *Valente–Kritzer Video v. Pinckney,* 881 F.2d 772, 775 (9th Cir.1989).

No magic words must be included in a document to satisfy § 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright. *Valente–Kritzer,* 881 F.2d at 775; *accord* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 10.03[A][2] at 10–37 ("As with all matters of contract law, the essence of the inquiry here is to effectuate the intent of the parties."). Section 204(a)'s "requirement is not unduly burdensome.... The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Carta; a one-line pro forma statement will do." *Effects Assocs.,* 908 F.2d at 557. "The writing should also serve as a guidepost for the parties to resolve their disputes." *Konigsberg,* 16 F.3d at 357.

Television Espanola first claims that a fax sent from New World to Television Espanola on November 9, 1994, satisfies § 204(a). In the fax, a New World executive, Alejandro Garcia, complains to Television Espanola about Television Espanola's decision not to buy The Bold and the Beautiful. Apparently, Television Espanola turned down The Bold and the Beautiful because New World sold one of its other programs, OP Center, to Antena 3. Garcia states in the fax that if Television Espanola had acted faster on OP Center it could have bought both OP Center and The Bold and the Beautiful. Garcia then wrote: "But it is not thus, very much in spite of all my desires and efforts. I ask you, what about Spiderman and Marvel? Perhaps it is not obvious to TVE the importance with which New World decided to close [the deal for that] [5] animation with

TVE." Garcia concluded that "[p]erhaps the mistake was mine in not having made Marvel and Beauty and Power a package...."

The Garcia fax does not satisfy § 204(a). There is nothing in the Garcia fax that sets forth the terms of any license agreement regarding Spiderman or Marvel Action Hour. Surely, the fax references a deal, but it does not specify anything about that deal or whether that deal is for an exclusive license for the program or for other broadcast rights. A mere reference to a deal without any information about the deal itself fails to satisfy the simple requirements of § 204(a). *See Konigsberg,* 16 F.3d at 357 (stating that the writing should "serve as a guidepost for the parties"). Without more, the comment in the Garcia fax is merely a part of negotiations rather than an "instrument of conveyance" or "memorandum of the transfer."

The second document relied upon by Television Espanola is a January 26, 1995, fax from New World's Operations Manager, Fefi Toll, to Television Espanola. That fax states that the Spiderman program should be "divided into two contracts which will be issued together and will provide as" stated in the rest of the fax. New World's Alejandro Garcia apparently authorized the division of the contracts, but they would "have to be done by year" and "the package cannot be broken up." The fax concludes: "[w]ith nothing further at this time, awaiting the contracts...."

Again, this piece of correspondence does not satisfy the requirements of § 204(a). First, as with the Garcia fax, there is no mention of a grant of an exclusive license; rather, the fax just talks about the delivering of episodes to Television Espanola. Second, with the fax concluding that New World is "awaiting the contracts," we can view the fax only as part of an ongoing back-and-forth between two parties ham-

---

5. The phrase "the deal for that" was inserted by the translator to make sense of the Spanish original that just stated that "New World decidio cerrar la animacion con TVE." Translat-

ed without the inserted phrase, that means that "New World decided to close the animation with TVE."

mering out the final details of the agreement. The statement that New World is waiting for the contracts "undercuts the hint of finality" that the fax may otherwise contain. *See Valente–Kritzer,* 881 F.2d at 775. Thus, as with the Garcia fax, the Toll fax does not constitute an "instrument of conveyance" or "memorandum of the transfer" as required by § 204(a).

 Television Espanola also argues that if the two faxes discussed above are not individually sufficient to satisfy § 204(a), they meet the requirements when looked at together and in conjunction with two other writings. The first extra writing is a New World internal deal memo. The deal memo lists the terms of a "new deal" between Television Espanola and New World: Spiderman and Marvel Action Hour for five years at a total license fee of $871,000. Written across the deal memo in large script letters is "Contract To Be Done by TVE [Television Espanola]." The second extra writing is a fax from Television Espanola to New World's Fefi Toll on September 16, 1994. That fax states that Television Espanola "would appreciate it if you would confirm to me the conditions of contract for" Spiderman and Marvel Action Hour. The fax then lists the dates, price, and delivery method for both series. At the end, the fax states that the "contracts will be sent" to New World.

 Those two documents, although more detailed than the two documents relied on by Television Espanola individually,[6] do not transform the other insufficient documents into writings that satisfy § 204(a). First, both of the additional documents refer to contracts that are pending. That language indicates that there is no finalized deal but rather merely negotiations that the parties are attempting to finalize. Without language indicating finality, § 204(a) is not satisfied. *See* 3 Nimmer, *supra,* § 10.03[A][3] at 10–38 ("[T]he mere preparation of written proposals back and forth, which never resulted in a final meeting of the minds, does not suffice to confirm a purportedly 'oral contract.'"). Second, neither of the faxes sent by New World (the Garcia fax and the Toll fax) reference these two additional writings. Without any reference to these additional writings, we are reluctant to somehow deem them incorporated into the two writings Television Espanola claims satisfy § 204(a). Thus, the two additional documents cited by Television Espanola do not change the fact that there is no writing satisfying the requirements of § 204(a). *See PMC, Inc. v. Saban Entertainment, Inc.,* 45 Cal.App.4th 579, 52 Cal.Rptr.2d 877, 884 (1996) (finding a series of documents "taken together" not to satisfy the requirements of § 204(a)).

None of the out-of-circuit cases relied upon by Television Espanola changes this conclusion. All of the cases in which other courts have found a writing to raise a triable issue of fact as to whether it satisfied § 204(a) contain much more compelling facts than those here. *See Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 413 (7th Cir.1992) (an actual sales agreement between parties); *Dean v. Burrows,* 732 F.Supp. 816, 823 (E.D.Tenn. 1989) (an endorsed check and a written transfer agreement recorded with the Copyright Office); *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.,* 690 F.Supp. 298, 300–01 (S.D.N.Y.1988) (two letters, one specifically stating that it authorized the transfer of ownership of the materials and the other an invoice for the sale of the

---

**6.** Television Espanola does not and cannot rely on these two extra documents individually. First, New World's internal deal memo cannot satisfy § 204(a) because it was never communicated to Television Espanola. *See Konigsberg,* 16 F.3d at 357 (indicating that whereas the common law statute of frauds does not require the writing to be communicated to the other party, § 204(a) does). Second, the memo from Television Espanola detailing the proposed contract terms does not satisfy § 204(a) because it was not written and signed by New World, the owner of the copyright. *See* 17 U.S.C. § 204(a) (stating that the transfer must be "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent").

materials); *Wales Indus. Inc. v. Hasbro Bradley, Inc.*, 612 F.Supp. 510, 514 (S.D.N.Y.1985) (a document stating that the party "does hereby sell, assign, transfer and set over to [the other party] the entire right, title and interest to any copyrights . . .").

Furthermore, three of those cases, *Dean*, *Kenbrooke Fabrics*, and *Wales Industrial* involve actions by third parties challenging a copyright transfer that the transferor and transferee agree took place. Courts have held that in situations "in which the copyright holder appears to have no dispute with its licensee on [the issue of transfer], it would be anomalous to permit a third party infringer to invoke this provision against the licensee." *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.1982); *accord Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir.1995) (adopting the rule of *Eden Toys*); *Kenbrooke*, 690 F.Supp. at 301 (applying the rule of *Eden Toys*); 3 Nimmer, *supra*, § 10.03[A][3] at 10–38. That circumstance is not present here.

 Section 204(a) has a simple requirement in order for a grant of an exclusive license to be valid—put it in writing. If the parties really have reached an agreement, they can satisfy § 204(a) with very little effort. Here, there is no genuine issue of material fact as to whether that minimal step was taken: it was not. Accordingly, the district court properly granted summary judgment in favor of New World based on § 204(a).[7]

## B. Denial of Costs

 We review de novo the district court's decision that it did not have the authority to award costs because New World's application was filed late. *See Russian River Watershed Protection Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1144 (9th Cir.1998).

Under Federal Rule of Civil Procedure 54(d)(1), costs are awarded to the prevailing party "as of course." Rule 54(d)(1) though does not specify a time for the prevailing party to file a bill of costs. The Central District of California's local rules fill that void by requiring a bill of costs to be filed within a period of "fifteen (15) days after entry of judgment." C.D. Cal. R. 16.3.[8] By the plain language of that rule, the triggering event for beginning the time period for filing the bill of costs is the "entry of judgment."

---

7. As an alternative ground for summary judgment, the district court ruled that there was no meeting of the minds necessary for the creation of a common law contract granting an exclusive license to Television Espanola. That ruling may or may not be correct; however, for grants of exclusive licenses, any meeting of the minds must be accompanied by a writing satisfying 17 U.S.C. § 204(a). Section 204(a) cannot be circumvented by parties arguing that the exclusive license was granted in a contract satisfying state common law. *See Valente–Kritzer*, 881 F.2d at 774 ("Section 204(a) not only bars copyright infringement actions but also breach of contract claims based on oral agreements."); *accord Marshall v. New Kids on the Block Partnership*, 780 F.Supp. 1005, 1009 (S.D.N.Y.1991) (To allow such an argument "would permit any alleged copyright infringer" to ignore copyright laws "by making an [sic] bland allegation that use of copyrighted material was within the terms of an oral license agreement."); *Library Publications, Inc. v. Medical Economics Co.*, 548 F.Supp. 1231, 1234 (E.D.Pa.1982) (state law breach of contract claim unsuccessful because of § 204(a)), *aff'd*, 714 F.2d 123 (3d Cir.1983); 3 Nimmer, *supra*, § 10.03[A][5] at 10–42 (listing among arguments that "courts have rejected" as "unavailing" the argument "characterizing the claim as one for breach of an oral contract rather than for infringement of the copyright orally transferred"). The district court's granting of summary judgment on the alternative ground that there was no meeting of the minds was thus unnecessary.

8. The full text of Local Rule 16.3 is as follows:

**BILL OF COSTS—FILING AND FORM—NOTICE**
The prevailing party who is awarded costs shall have fifteen (15) days after entry of judgment to file and serve a Bill of Costs. The Bill of Costs shall be attached to a Notice of Application to the Clerk to Tax Costs.

What constitutes "entry of judgment" is delineated by the Federal Rules of Civil Procedure and the Local Rules for the Central District of California. Federal Rule 58, entitled "Entry of Judgment," states in pertinent part as follows: "Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)." Fed.R.Civ.P. 58. Rule 79(a), entitled "Books and Records Kept by the Clerk and Entries Therein: Civil Docket," sets forth the requirements for how the clerk of the court must enter items in the civil docket. The relevant portion of Rule 79(a) is as follows:

All papers filed with the clerk, all process issued and returns made thereon, all appearances, orders, verdicts, and judgments shall be entered chronologically in the civil docket on the folio assigned to the action and shall be marked with its file number. These entries shall be brief but shall show the nature of each paper filed or writ issued and the substance of each order or judgment of the court and of the returns showing execution of process. The entry of an order or judgment shall show the date the entry is made.

Fed.R.Civ.P. 79(a).

 The two rules go hand in hand: Rule 58 tells the parties what types of documents constitute judgment, and Rule 79(a) tells the parties how the clerk must enter those documents on the civil docket. Only when both rules are satisfied is there an "entry of judgment." *See* Fed.R.Civ.P. 58 ("A judgment is effective only when so set forth [according to Rule 58] and when entered as provided in Rule 79(a)."); *cf. Calhoun v. United States*, 647 F.2d 6, 8–9 (9th Cir.1981) (both requirements must be

met for there to be entry of judgment triggering notice of appeal filing periods).

 Central District local rules not only set forth the time period for filing a bill of costs but also clarify what cannot constitute an "entry of judgment" in the Central District under Rules 58 and 79(a). Local Rule 14.10.5 provides as follows:

**ENTRY OF JUDGMENT—MEMORANDUM OF DECISION, OPINION, MINUTE ORDER**—Notation in the civil docket of entry of a memorandum of decision, an opinion of the Court, or a minute order of the Clerk shall not constitute entry of judgment pursuant to F.R.Civ.P. 58 and 79(a) unless specifically ordered by the judge.

C.D. Cal. R. 14.10.5. The Local Rule is a clarification of Rule 58 and furthers the separate document requirement by stating that memorandums of decision, opinions, and minute orders will not satisfy the requirements of Rule 58, even when entered into the civil docket. The local rule provides an exception, whereby a Central District judge may use such documents to constitute entry of judgment under Rule 58 if the judge specifically and affirmatively orders that "notation in the civil docket" of such a document shall "constitute entry of judgment pursuant to F.R.Civ.P. 58 and 79(a)." Said another way, the clerk's act of entering a minute order-even a minute order that would satisfy the separate document requirement-can not effect an entry of judgment unless the district court judge specifically orders it to be so.[9]

With that background, we must look to the facts of this case to determine whether there was an "entry of judgment" on August 6; if there was an "entry of judg-

---

9. The procedure under Local Rule 14.10.5 is not required for actual written judgments by the court. Rather, the local rule only applies to memorandum decisions, opinions and minute orders. At the time of this case, the Central District Local Rule 14.4, entitled Judgment, stated as follows: "The judgment shall be set forth on a separate document as required by F.R.Civ.P. 58. The judgment shall follow, as nearly as possible, F.R.Civ.P. Official Forms No. 31 or No. 32." Thus, if the district court had merely used a separate document which approximated Official Forms No. 31 or No. 32 to order judgment, we could have avoided this entire inquiry and it would have been clear to the parties that judgment had been entered.

ment" on that date, New World's bill of costs, filed on October 17, was untimely.

■ The official court record contains a document dated August 5, 1997, with the standard heading "Civil Minutes—General." This type of document is commonly referred to as a "minute order." A minute order is "a description of what transpired in the courtroom." *Carter v. Beverly Hills Sav. & Loan Ass'n,* 884 F.2d 1186, 1189 (9th Cir.1989). The order notes that only the district court judge and the deputy clerk were present; no attorneys or court reporter were present. Under the heading "proceedings" is the following:

> Before the Court is Defendant's motion for summary judgment and Defendant's motion for leave to file a counterclaim.
>
> For the reasons stated at the hearing on August 4, 1997, the Court concludes that there was no meeting of the minds and the parties did not form a contract. The Court further finds that RTE has not demonstrated a writing transferring New World's rights in Spiderman and Marvel Action Hour to RTE that is signed by New World and communicated to RTE as required by 17 U.S.C. § 204(a). Therefore, Defendant's motion for summary judgment is granted.
>
> Defendant's motion for leave to file a counterclaim is mooted because Defendant's counsel stipulated at the hearing that the counterclaim would be withdrawn if the motion for summary judgment was granted.

IT IS SO ORDERED.

The judge did not sign the document. Only the initials of the deputy clerk appear on the bottom right corner of the document. Two stamps appear on the top of the document indicating that it was filed on August 5 and entered on August 6.[10]

The corresponding entry in the civil docket for the case classified the filing as minutes:

> 8/5/97 70 MINUTES: granting motion for summary judgment [39–1]. (ENT 8/6/97) MD JS 6 mld cpys & ntc terminating case by Judge William D. Keller CR: none present (pbap) [Entry date 08/06/97]

In contrast, other entries in the civil docket for the case begin with other capitalized words such as "ORDER," "OBJECTIONS," "JUDGMENT," and "NOTICE."

■ As noted above, in order to constitute entry of judgment, the document must meet the requirements of Local Rule 14.10.5; the judge must "specifically order[ ]"that the minute order shall constitute entry of judgment upon the notation in the docket. The judge-not the clerk-must make that order. *See Wood v. Coast Frame Supply, Inc.,* 779 F.2d 1441, 1442 (9th Cir.1986). Nothing of the sort occurred here. The judge did not write any language upon the minute order which would indicate that he was ordering that the notation in the docket would constitute entry of judgment. Nor did the judge execute a separate document to order that the notation on the docket of minute order should constitute entry of judgment.

■ The language "IT IS SO ORDERED" which appears on the clerk's minute order is insufficient to meet the local rule's requirement. This language merely indicates that summary judgment was ordered and does not order that notation in the civil docket shall constitute entry of judgment. Further, we do not believe that the Rule 77(d) stamp stating "THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP RULE 77(d)," placed on the minute order

---

**10.** Television Espanola claims that the minute order also contained a stamp stating "THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d)" and that the stamp demonstrated that the minute order was an entry of judgment. New World responds that the copy of the minute order it obtained from the court record did not contain that stamp and thus could not constitute notice. Our resolution of the cost issue below does not require us to address the issue of the effect of a failure to notify under Federal Rule 77(d) on filing a bill of costs.

by the clerk, is sufficient to bring the minute order within the requirements of the local rule. Notice of entry pursuant to Rule 77(d) does not answer whether the judge specifically ordered the minute order to be entered pursuant to Local Rule 14.10.5. Because we hold that the minute order does not satisfy the requirements of Local Rule 14.10.5 to constitute entry of judgment, we need not determine whether the minute order also satisfies the separate document requirement of Rule 58.[11]

There was no entry of judgment on August 6, 1997. As such, the time for filing a bill of costs did not begin to run upon the docket entry of the August 5th minute order. Without any judgment entered on August 6, New World was not required at that point in time to file its bill of costs. The district court's decision of November 25 to the contrary was in error.

■■■ We note further that the district court's November 25 minute order was rendered in the absence of jurisdiction. When Television Espanola's appeal of the district court's decision was docketed with the Ninth Circuit on October 22, 1997, the district court lost jurisdiction to review its October 6 entry of judgment. *See* Fed. R.Civ.P. 60(a) ("During the pendency of an appeal, [mistakes in judgment] may be so corrected before the appeal is docketed in

the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court."). Thus, technically, the district court's October 6 entry of judgment remains valid,[12] and New World's bill of costs lodged with the district court on October 17 is a timely application for costs under Local Rule 16.3. All that remains for the district court to do · is evaluate the bill and award costs to New World.

Although the decision we render today on this issue may seem to be based on legal minutiae, the matters at stake are weighty. The due administration of justice would be incomplete without giving the prevailing party fair notice of the need to file a bill of costs. When a court does not follow the federal rules or its own local rules, it cannot expect the prevailing party to be aware of its rights. In the Central District of California, to give the prevailing party that awareness, simple procedures such as rendering a judgment in a separate document and entering that judgment *as a judgment* on the civil docket are all that have to be followed. The rules require no more than that, but cannot be satisfied with less.

### III. CONCLUSION

The district court's grant of summary judgment in favor of New World is af-

---

**11.** The most recent cases in which this circuit has discussed whether a minute order constituted entry of judgment have no bearing on this case because they do not address entry of judgment within the context of the Central District Local Rules. *See Ingram v. ACandS, Inc.*, 977 F.2d 1332, 1338–39 (9th Cir.1992) (finding minute order sufficient because the document stated it was an order, was signed by the clerk, was mailed to counsel and entered on docket as an order); *Carter v. Beverly Hills Sav. & Loan Ass'n*, 884 F.2d 1186, 1189–90 (9th Cir.1989) (finding minute order insufficient because it was not "a separate order" because not signed by the deputy clerk who prepared it, did not contain "order" language and was not "entered as an order" on the docket); *Beaudry Motor Co. v. Abko Properties, Inc.*, 780 F.2d 751, 755 (9th Cir.1986) (finding minute order sufficient because it contained "order" language, signed by the clerk, contained file stamps, was mailed to

the parties, and was entered as an order on the docket); *Calhoun v. United States*, 647 F.2d 6, 9–10 (9th Cir.1981) (finding minute order failed as a separate document, was not mailed to the parties and was not entered as an order). Even within the context of those cases, the minute order here may not constitute entry of judgment because it was not entered as an order on the civil docket.

**12.** Television Espanola's appeal was taken from the August 6th entry of the minute order. Because the August 6th entry of the minute order was not entry of judgment under the local rules, Television Espanola's appeal was premature. However, under our rules, the appeal is deemed as if filed on October 6th. *See* Fed. R.App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order but before the entry of judgment or order is treated as filed on the date of and after the entry.").

firmed. On the issue of costs, we reverse the district court's determination that New World's bill of costs was untimely and remand for an award of costs to New World.

AFFIRMED in part, REVERSED in part, and REMANDED.

Costs on appeal are awarded to New World.