[No. B235100. Second Dist., Div. Eight. Nov. 7, 2012.]

MVP ENTERTAINMENT, INC., Plaintiff and Appellant, v.
MARK FROST et al., Defendants and Respondents.

COUNSEL

Lavely & Singer, Martin D. Singer and Henry L. Self III for Plaintiff and Appellant.

Kinsella Weitzman Iser Kump & Aldisert, Dale F. Kinsella and Jonathan P. Steinsapir for Defendants and Respondents.

OPINION

**FLIER, Acting P. J.**—Title 17 United States Code section 204(a) (section 204), part of the Copyright Act of 1976 (Pub.L. No. 94-553 (Oct. 19, 1976) 90 Stat. 2541), provides: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." We affirm the entry of summary judgment against appellant MVP Entertainment, Inc. (MVP), because it failed to raise a triable issue of material fact that it had a valid

transfer of copyright under section 204. No evidence showed that the purported transfer was signed by respondents Mark Frost's and Good Comma Ink's duly authorized agent, evidence of which was essential to each of appellant's causes of action.

## FACTS AND PROCEDURE

Frost wrote The Match: The Day the Game of Golf Changed Forever (2007) (The Match). The copyright for The Match is assigned to Good Comma Ink, of which Frost is the sole owner. MVP and its president, Robert Frederick, sought to obtain rights to make a movie based on The Match.

In late 2008 and early 2009, the parties' attorneys—Alan Wertheimer and William Jacobson—corresponded about MVP's potential purchase of the copyright for The Match. On April 30, 2009, Jacobson, on behalf of MVP, sent Wertheimer an e-mail proposing certain terms and stating, "Let me know if this is okay and we'll send paperwork . . . ." Wertheimer responded, "done . . . thanks! Werth."

On May 19, 2009, Jacobson sent Wertheimer an agreement. On July 23, 2009, Frederick wrote Jacobson, stating he would like to have the agreement signed by August 17 or 18. No formal agreement was signed.

In the summer of 2009, Frost met with Frederick and shortly afterwards told Frederick he did not want MVP to make The Match into a movie. That spawned this lawsuit for breach of contract, promissory estoppel, declaratory relief, and negligent misrepresentation. MVP's overarching claim was that the parties entered into a contract or promised MVP they would enter into a contract to allow MVP to make a movie of The Match. According to MVP, Wertheimer's e-mail stating "done . . . thanks! Werth" was signed by Wertheimer and created a binding contract.

Respondents moved for summary judgment. In his declaration in support of summary judgment, Wertheimer averred that he was responsible for negotiating deals for Frost regarding literary works but never signed contracts on Frost's behalf. Wertheimer stated that neither Frost nor Good Comma Ink authorized him to transfer any rights in their intellectual property, including in The Match. Wertheimer's e-mail stating "done . . . thanks" was not intended to convey any of Frost's rights. The e-mail "was intended to simply note that the parties were in accord on the broad economic terms of a deal." Wertheimer averred that he did not intend his typed nickname "Werth" to constitute a signature or to bind himself or Frost to anything.

In his declaration in support of summary judgment, Frost averred that Wertheimer negotiated deals but never signed contracts on his behalf. Frost

further averred that he never gave Wertheimer authority to transfer any rights in his intellectual property including The Match. Frost met with Frederick in the summer of 2009 and concluded that MVP was not the right entity to make The Match into a movie and advised Frederick of the same.

In a declaration in opposition to summary judgment, Jacobson averred that he is a transactional attorney and negotiated with Wertheimer about making a movie of The Match. Jacobson believed that Wertheimer's e-mail "done . . . thanks" created a binding contract. Wertheimer led him to "reasonably believe" that Wertheimer was respondents' "duly authorized agent" as defined in Labor Code section 1700.4, subdivision (a) (but not 17 U.S.C. § 204).[1] According to Jacobson, transactional attorneys routinely entered into agreements on behalf of their clients.

In his declaration in opposition to summary judgment, Frederick averred he believed the e-mail "done . . . thanks" created a binding contract. Frederick stated that he reasonably believed Wertheimer was Frost's duly authorized agent. Frost provided Frederick a pitch memorandum in August 2009, and Frederick understood the pitch memorandum to mean that the "deal had been closed." Frost also sent Frederick copies of the book and gave approval of a draft brochure for marketing the movie.

The trial court granted summary judgment based on section 204. The court concluded that a transfer of ownership was invalid unless signed by the owner or the owner's duly authorized agent. The court further concluded that even if express authority were not required, respondents did nothing to suggest that Wertheimer had authority to transfer the property. This appeal followed.

## DISCUSSION

█ " 'A transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.' [Citations.] 'The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the

---

[1] Labor Code section 1700.4, subdivision (a) provides: " 'Talent agency' means a person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists, except that the activities of procuring, offering, or promising to procure recording contracts for an artist or artists shall not of itself subject a person or corporation to regulation and licensing under this chapter. Talent agencies may, in addition, counsel or direct artists in the development of their professional careers."

Magna Charta; a one-line pro forma statement will do.' [Citation.] The Copyright Act's writing requirements are intended to force parties to bargain carefully and to determine precisely what rights are being transferred, and at what price." (*PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 591 [52 Cal.Rptr.2d 877] (*PMC*), disapproved on another ground in *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159, fn. 11 [131 Cal.Rptr.2d 29, 63 P.3d 937].) "Unlike common law statutes of frauds (e.g., Civ. Code, § 1624), section 204 of the Copyright Act serves more than an evidentiary function. Without a writing, a transfer of copyright is not valid and the transfer is not effective. [Citations.] Further, the writing requirements under section 204 are more stringent than the common law statute of frauds. The writing must be intended as a memorandum of contract communicated to the other party and the equitable defense of estoppel does not apply." (*PMC*, at pp. 591–592.)

Here, it is undisputed that Wertheimer did not have actual authority to transfer the copyright in The Match. Appellant argues it raised a triable issue of fact whether Wertheimer had ostensible authority. However, as we explain, section 204 requires actual authority; ostensible authority is insufficient.

 Under California law, ostensible authority "is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."[2] (Civ. Code, § 2317.) Ostensible authority, as defined under California law, is insufficient to transfer a copyright because section 204 requires a writing signed by the copyright owner or the owner's *duly authorized agent*. Based on this requirement, an attorney cannot transfer a copyright without the owner's signature "or some express authorization" from the owner. (*Valente-Kritzer Video v. Pinckney* (9th Cir. 1989) 881 F.2d 772, 775.) Requiring express authorization from the copyright owner to effectuate a transfer is consistent with the purpose of section 204 to "ensure that the author 'will not give away his copyright inadvertently' and [to] 'force[] a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price.' [Citation.]" (*Konigsberg Internat. Inc. v. Rice* (9th Cir. 1994) 16 F.3d 355, 356–357.) Assuming Wertheimer had ostensible authority, such authority was insufficient to effectuate a transfer of the copyright in The Match. MVP's

---

[2] In arguing that Wertheimer had ostensible authority, MVP emphasizes Jacobson's representation that "[i]t is industry custom and practice for transactional attorneys to routinely enter into agreements on behalf of their clients. An entertainment attorney's indication that a deal is closed is typically understood to mean (correctly) that he or she has been authorized by the client to consummate the transaction, sometimes followed by the drafting of a written long form agreement." This fact potentially would be material if MVP could show that ostensible authority was sufficient to transfer a copyright. But because MVP has failed to demonstrate that predicate, this "fact" is irrelevant.

and Jacobson's belief (whether or not reasonable) that Wertheimer was Frost's duly authorized agent is irrelevant.

■ This conclusion is supported by *Pinkham v. Sara Lee Corp.* (8th Cir. 1992) 983 F.2d 824, in which the court distinguished authority under the Copyright Act of 1976 from other authority. The court explained that copyright law is distinguishable from general agency law. (*Pinkham,* at p. 829.) "Apparent authority is usually based on the principle that when one of two innocent parties must suffer from the wrongful act of another, the loss should fall on the one whose conduct created the circumstances which allowed the third party to perpetrate the wrong and cause the loss. [Citation.] On the other hand, liability for copyright infringement proceeds on the principle that 'as between two innocent parties (i.e., the copyright owner and the innocent infringer) it is the latter who should suffer since he, unlike the copyright owner, either has an opportunity to guard against the infringement by diligent inquiry, or at least the ability to guard against liability for infringement by an indemnity agreement from his supplier or by an "errors and omissions" insurance policy.' [Citation.]" (*Ibid.*)

■ Because MVP failed to raise a triable issue of fact showing that Wertheimer was respondents' duly authorized agent, its remaining arguments cannot defeat summary judgment.[3] MVP fails to show one prerequisite to transfer copyright, and therefore even if it can demonstrate other necessary elements, it cannot defeat summary judgment.

■ The failure to raise a triable issue of fact as to compliance with section 204 defeats all of MVP's causes of action. "When the cause of action is merely a guise for an encroachment of the federal laws, the state cause of action is preempted. [Citations.] However, when an extra element is added by virtue of the charges, state causes of action may be brought." (*PMC, supra,* 45 Cal.App.4th at p. 594, fn. 8.) MVP's cause of action for breach of contract is based on the parties' alleged agreement, which as explained, MVP cannot prove. MVP's cause of action for promissory estoppel cannot stand because estoppel does not apply to save a contract that fails to comply with section 204. (*PMC,* at pp. 591–592.) MVP's cause of action for declaratory relief is a request for a declaration "that there is a valid enforceable contract" giving MVP an ownership interest in The Match, a claim dependent on showing an enforceable contract. Because MVP failed to comply with section 204, there is no valid enforceable contract.

---

[3] Specifically, MVP argues that (1) the "signature" on the e-mail "Werth" constituted an electronic signature pursuant to the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7006(5)); (2) Wertheimer's lack of intent to sign the e-mail is irrelevant; and (3) the e-mail message was sufficient to constitute a writing.

With respect to its claim for negligent misrepresentation, MVP argues that the following misrepresentations are independently actionable: (1) "Frost did not in fact intend to cooperate with MVP's production efforts" and (2) Frost led MVP and its counsel "to reasonably believe that Mr. Wertheimer was Frost's duly authorized agent . . . ." But the only alleged misrepresentation in the complaint was that respondents "directly and/or through their duly appointed representatives, promised, assured or represented to MVP that it would be able to purchase the right to produce a motion picture based on *The Match*," a theory that MVP does not advance on appeal. With respect to MVP's new theories, Frost's attempt to cooperate with MVP would be relevant only if the parties had a contract under section 204. And the latter theory cannot stand because MVP fails to identify any conduct by Frost suggesting Wertheimer was Frost's duly authorized agent. MVP points out that Frost attended a pitch meeting, sent a box of books, and received a promotional brochure, but none of that conduct suggests that Wertheimer was Frost's duly authorized agent. It simply does not bear on Frost and Wertheimer's relationship. The trial court properly granted summary judgment.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

Grimes, J., and Sortino, J.,[*] concurred.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.