**BANGKOK BROADCASTING & T.V. CO., LTD., a Thailand Corporation, Plaintiff,**

v.

**IPTV CORPORATION, a California Corporation, et al., Defendants.**

**And Related Counterclaim.**

**No. CV 09–03803 SJO (SSx).**

United States District Court, C.D. California.

May 11, 2010.

1104

Howard Wisnia, Sanjay Bhandari of Baker & McKenzie, for Plaintiff.

Reza Sina, Sina Law Group, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION [Docket Nos. 121, 123]

S. JAMES OTERO, District Judge.

This matter is before the Court on Plaintiff Bangkok Broadcasting & T.V. Co., Ltd.'s ("Plaintiff" or "BBTV") Motion for Summary Judgment, and Defendants IPTV Corporation ("IPTV"), BKT Group, Inc. ("BKT"), Ron Petcha, Tip Petcha, and Noppadon Wongchaiwat's ("Wongchaiwat") (collectively, "Defendants") Motion for Summary Judgment or, in the Alternative, for Partial Summary Adjudication, both filed on March 8, 2010. The parties filed Oppositions and Replies to the respective Motions. The Court heard argument on May 10, 2010, the date set for pretrial conference. For the following reasons, the Court **GRANTS** Partial Summary Adjudication in favor of Plaintiff and Defendants' Motion is **DENIED.**

## I. *BACKGROUND*

BBTV is a Thai broadcasting corporation that operates Channel 7, one of the six major free television channels in Thailand, which broadcasts news reports, sports programs, and variety shows. (First Am. Compl. ("FAC") ¶¶ 9, 44–49; Pl.'s Separate Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ("Pl.'s SOF") ¶ 1; Defs.' Statement of Genuine Issues of Material Facts ("Defs.' SOF") ¶ 1) BBTV owns U.S. copyright registrations for many of its programs, including the ones at issue. (FAC ¶ 52, Ex. 1; Pl.'s SOF ¶ 2; Joint Statement of Undisputed Facts ("JSUF") ¶¶ 20–29; Defs.' SOF ¶ 2.) In addition, the U.S. Patent and Trademark Office granted BBTV federal registration for its insignia, three overlapping circles with a number "7" appearing in the middle, which appears in the top right-hand corner of all of its programs. (FAC ¶¶ 56–62; JSUF ¶¶ 26–29.) The validity of Plaintiff's copyright and trademark registrations is not disputed. (JSUF ¶¶ 20–29.)

IPTV is a California corporation that provides Thai television programs, in various formats, to Thai communities in the United States ("United States" or the "U.S.") and abroad. (FAC ¶¶ 10, 78–89.) It is disputed, however, whether BKT, which is also a California corporation, is the parent company and controlling entity of IPTV. (FAC ¶ 13; Pl.'s Statement of Genuine Issues in Opp'n to Defs.' Mot. for

Summ. J., or Alternatively Summ. Adjudication ("Pl.'s SOF in Opp'n") ¶ 39–42; Defs.' Statement of Uncontroverted Facts and Conclusions of Law in Supp. Mot. for Summ. J. ("Defs.' Addt'l SOF") ¶¶ 39–42.) As to the individual Defendants, Ron Petcha, Tip Petcha, and Wongchaiwat are alleged to be "employed, own[ ], operate[ ] and/or supervise[ ] the operation of BKT and IPTV" and to "authorize[ ] and direct[ ] BKT's and IPTV's activities," as well as to "derive economic benefit from their business operations." (FAC ¶¶ 122–28, 29–33, 34–40; Pl.'s SOF in Opp'n ¶¶ 22–29, 30–38; Pl.'s SOF ¶¶ 5–6; Defs.' SOF ¶ 5; Defs.' Addt'l SOF ¶¶ 22–38.)

Plaintiff contends that from "at least approximately August 1, 2008 to July 31, 2009, Defendants reproduced, distributed, publicly performed and/or publicly displayed BBTV's programs (i.e., the programs listed in Exhibits 1 and 2 to the FAC) by (i) offering for sale or rental tapes, VCDs and DVDs containing BBTV's programs, and (ii) rebroadcasting BBTV's programs in the U.S. and abroad via satellite TV, cable TV, broadband internet, and other means." (FAC ¶¶ 12, 66–73, 78–82; Pl.'s SOF ¶ 4.) Defendants do not dispute this. (JSUF ¶¶ 22–25; Defs.' SOF ¶ 4.)

"Beginning in 2003, IPTV entered into a series of sublicense agreements [which allowed] it to exploit BBTV's programs in the [U.S.]" (JSUF ¶ 1; Defs.' SOF ¶ 3.) The final sublicense agreement "between Media of Medias and IPTV was entered into on August 2007 and terminated on July 31, 2008." (JSUF ¶ 2.) Media of Medias did not renew this sublicense agreement. (JSUF ¶ 3.) Consequently, on July 15, 2008, Ron Petcha met with members of

BBTV's "Consideration of Program Schedule and Air Time Rental Committee (the "CPSATR Committee"), including Mr. Chalor Nark-on (the Chairman of the CPSATR Committee), and Pattanapong Nuphan ("Nuphan"), a member of the CPSATR Committee, at BBTV's headquarters in Bangkok, Thailand." [1] (JSUF ¶ 4; Defs.' SOF ¶ 6.) Ron Petcha "offered BBTV $220,000 for a new annual license, [but] which BBTV rejected." (Pl.'s SOF ¶ 7; Defs.' SOF ¶ 7.)

Subsequent to the July 15, 2008 meeting, the parties met again, but do not agree on what was resolved or concluded during their subsequent meetings and/or correspondences. "On August 17, 2008, Ron Petcha attended a meeting in Bangkok with BBTV's [CPSATR Committee], . . . . wherein the parties discussed matters bearing on the potential renewal of a license agreement." (Pl.'s SOF ¶ 8; Defs.' SOF ¶ 8.) "IPTV sent and BBTV received a letter dated August 18, 2008, proposing to pay $240,000 for a one-year renewal of IPTV's prior license rights for BBTV's work." (Pl.'s SOF ¶ 9; Defs.' SOF ¶ 9.) However, on August 29, 2008, BBTV rejected IPTV's August 18, 2008 proposal "as insufficient, and [instead, BBTV] ma[de] an offer of more limited rights for one year at $220,000." (Pl.'s SOF ¶ 10; Defs.' SOF ¶ 10.)

Defendants claim that Ron Petcha "reached a binding oral license agreement with [Nuphan] during a September 1, 2008 telephone call between" the two men. (Pl.'s SOF ¶ 11; JSUF ¶ 11; Defs.' SOF ¶ 11; Defs.' Addt'l SOF ¶ 16.) "Based on the September 1, 2008 [oral] agreement, IPTV continued to exploit BBTV's pro-

1. Defendants allege that although no agreement was reached during the July 2008 meeting, "[Ron] Petcha was told to continue to negotiate with Nuphan." (Defs.' Addt'l SOF ¶¶ 7, 18.) "Nuphan was always one [of] the highest ranked officers with whom IPTV had ever dealt with at BBTV. The [C]hairman Chalor Nark-on told [Ron] Petcha that the only remaining detail to resolve was the price which would be determined by Nuphan." (Defs.' Addt'l SOF ¶ 17.)

gramming." (Defs.' Addt'l SOF ¶ 21.) Defendants therefore assert that "[a]n agreement for the use of BBTV's content was reached … where IPTV would pay $45,000 per month to BBTV for[:] (1) exclusive rights to BBTV's programming in the United States and Canada[;] (2) non-exclusive rights in Europe[;] and (3) BBTV's assumption of the obligation to pursue infringement suits. No agreement was ever reached for a standalone exclusive license." (Defs.' SOF ¶ 12.) Defendants' Opposition states that "the negotiations concerned a bundle of rights, not rights independent of one another." (Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n") 1.) The negotiations relating to this so-called "bundle of rights" will therefore, be referred to by the Court as the "Bundle Agreement." Plaintiff, however, argues that "Defendants have repeatedly and under oath claimed that IPTV's alleged oral license agreement with BBTV was an exclusive license within the U.S. and Canada, and indeed that IPTV would not have agreed to pay $45,000 per month in license fees if the license was not exclusive."[2] (Pl.'s SOF ¶ 12.) In response, Defendants claim that they "have never asserted that the license [relating to the U.S. and Canada] was … exclusive."[3] (Defs.' SOF ¶ 12.)

In any event, Plaintiff contends that Nuphan "spoke to [Ron Petcha] over the telephone on September 3, 2008, in IPTV's words[,] 'to repudiate' the discussions of September [1, 2008,] conveying that BBTV would not go forward on the basis of the terms discussed on September 1 [, 2008]." (Pl.'s SOF ¶ 5.) Plaintiff argues, and De-

fendants admit, that "[n]o written license agreement was ever signed by both parties as a result of the 2008 license negotiations; BBTV never sent IPTV a formal license agreement to memorialize any alleged oral license agreement…." (Pl.'s SOF ¶ 16; JSUF ¶ 18; Defs.' SOF ¶ 16.) Defendants, however, contend that Nuphan's September 3, 2008 call was to inform IPTV that BBTV intended to breach the September 1, 2008 agreement "due to a change of mind." (Defs.' SOF ¶ 15.)

Subsequently, "BBTV sent and IPTV received a letter dated October 17, 2008, … revoking BBTV's August 29, 2008 offer to the extent it was outstanding." (Pl.'s SOF ¶ 17; JSUF ¶ 14; Defs.' SOF ¶ 17.) Then, on October 20, 2008, IPTV sent BBTV an e-mail "claiming a license agreement was formed on September 1[,] [2008]." (Pl.'s SOF ¶ 18; JSUF ¶ 15; Defs.' SOF ¶ 18.) In response, BBTV sent IPTV a letter "dated November 5, 2008, stating … that 'no agreement on TV program license between … BBTV and IPTV has yet been concluded or agreed.'" (Pl.'s SOF ¶ 19; JSUF ¶ 16; Defs.' SOF ¶ 19.) "After the November 5, 2008 letter, the parties had no substantive contact until May 2009." (Pl.'s SOF ¶ 20; JSUF ¶ 17; Defs.' SOF ¶ 20.)

On May 28, 2009, Plaintiff filed suit against Defendants. On January 26, 2010, Plaintiff amended its Complaint to include the following causes of action: (1) direct copyright infringement pursuant to 17 U.S.C. § 501, *et seq.;* (2) trademark infringement pursuant to 15 U.S.C. §§ 1114, 1125(a); (3) common law trademark in-

---

**2.** Plaintiff notes that "IPTV has never made any of the monthly payments of $45,000 to BBTV required under the alleged oral license." (Pl.'s SOF ¶ 13; JSUF ¶ 19; Defs.' SOF ¶¶ 13, 14.)

**3.** Defendants' Opposition asserts that "IPTV did not purchase an exclusive license for U.S.

and Canada rights *only,*" thereby seemingly conceding that the U.S. and Canada license was exclusive. (Defs.' Opp'n 1, 6, 12.) Defendants' Opposition also states that "all of BBTV's arguments fail because it has relied on a false premise that IPTV obtained an exclusive license." (Defs.' Opp'n 2.)

fringement; (4) trademark dilution in violation of the Lanham Act; (5) unfair competition and false designation of origin, 15 U.S.C. § 1125(a); (6) common law and California Business and Professions Code § 17200, *et seq.*; (7) inducement and contributory infringement; (8) vicarious infringement; (9) breach of contract by IPTV; (10) breach of oral agreement by IPTV; (11) constructive trust, California Civil Code § 2224. (*See generally* FAC.)

Defendants assert several counterclaims, including: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) breach of covenant of good faith and fair dealing; and (5) intentional interference with prospective and contractual relations. (*See generally* Answer.) Additionally, Defendants assert the following affirmative defenses: (1) equitable estoppel; (2) laches; and (3) unclean hands. (*See generally* Answer.)

Both sides now move for summary judgment or, alternatively, partial summary adjudication. Plaintiff contends that "[s]ummary judgment of copyright infringement is appropriate against Defendants IPTV and Ron Petcha." (Pl.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Pl.'s Mot.") 1.) Further, Plaintiff argues that in light of 17 U.S.C. § 204(a) (" § 204(a)"), IPTV's counterclaims, "which merely restate as claims IPTV's defense of an oral license agreement," are rendered infirm. (Pl.'s Mot. 1.) Finally, Plaintiff alleges that "IPTV cannot prove any damages." (Pl.'s Mot. 1–2.)

Defendants contend that they are "entitled to summary judgment because there is no genuine dispute of material of [sic] fact that IPTV and BBTV ... entered into an oral agreement for a license for the 2008–2009 term." (Defs.' Mot. for Summ. J. or, in the Alternative, for Summ. J. ("Defs.' Mot.") 1.) Alternatively, Defendants argue that "Tip Petcha and Wongchaiwat are entitled to summary judgment because BBTV cannot prove infringement, whether contributory or inducement, against them." (Defs.' Mot. 1.) Defendants allege that BKT is also entitled to summary judgment "because there is no evidence of any infringing activity by BKT." (Defs.' Mot. 1.)

## II. DISCUSSION

### A. Summary Judgment Standard

■ Summary judgment is proper only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). A "material" fact is one that could affect the outcome of·the case under the governing substantive law, and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed.Cir.2008) (internal citation omitted).

In determining whether a genuine issue of material fact exists, the court must not make credibility determinations or weigh conflicting evidence. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Rather, the court must view the evidence in the light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor. *Id.* (internal citation omitted); *see Atlanta Attachment Co.*, 516 F.3d at 1365 (internal citation omitted); *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045 (Fed.Cir.2001) (internal citations omitted).

### B. Copyright Infringement

■ To prove copyright infringement, a plaintiff must establish the following: (1) ownership of the allegedly infringed prod-

uct; and (2) the defendant's exploitation of at least one exclusive right granted to the copyright owner under 17 U.S.C. § 106.[4] *See Perfect 10, Inc. v. Amazon.com, Inc.,* 487 F.3d 701, 715, *amended on reh'g,* 508 F.3d 1146 (9th Cir.2007); *see also* 17 U.S.C. § 106. Three of the exclusive rights granted to copyright owners include reproduction, distribution, and public display of the copyright. *See* 17 U.S.C. § 106. Here, Defendants do not dispute that Plaintiff owns valid and enforceable copyrights in the various audiovisual programs at issue. (Pl.'s Mot. 6; Defs.' Opp'n 1; *see generally* JSUF.) Thus, it is clear that the first element of a copyright infringement claim is established: Plaintiff's ownership of the allegedly infringed programs at issue. *See* 17 U.S.C. § 106. However, the parties dispute whether Defendants unlawfully exploited at least one of Plaintiff's exclusive rights granted to it under 17 U.S.C. § 106.[5] (Pl.'s Mot. 11; *see generally* Defs.' Opp'n.)

### 1. *Transfer of Copyright*

■ "The law couldn't be clearer: The copyright owner of a motion picture or other audiovisual work has the exclusive rights to copy, distribute or display the copyrighted work publicly." *Effects Assoc., Inc. v. Cohen ("Effects"),* 908 F.2d 555, 556 (9th Cir.1990) (internal citations omitted); *see Konigsberg Int'l, Inc. v. Rice,* 16 F.3d 355, 356 (9th Cir.1994) ("[A] transfer of copyright is simply not valid without a writing."). "[S]ection 204(a) of the Copyright Act invalidates a purported transfer of ownership unless it is in writing." [6] *Id.; see* 17 U.S.C. § 204(a); *see Radio Television Espanola S.A. v. New World Entm't, Ltd.,* 183 F.3d 922, 927 (9th Cir.1999) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of the transfer is in writing and signed by the owner of the rights conveyed or [by] such owner's duly authorized agent."); *see also Weinstein Co. v. Smokewood Entm't Group, LLC,* 664 F.Supp.2d 332 (S.D.N.Y.2009)

**4.** 17 U.S.C. § 106 provides: "the owner of copyright under this title has exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, or dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, or dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. § 106.

**5.** The Court notes that on May 28, 2009, Plaintiff filed a Motion for Preliminary Injunction. (*See generally* Pl.'s Mem. of P. & A.

in Supp. of its Mot. for a Prelim. Inj. ("Pl.'s Mot. for Prelim. Inj.")) Plaintiff's Motion for Preliminary Injunction wholly failed to address the issue of whether 17 U.S.C. § 204(a) was implicated. Because at that stage, it remained unclear whether U.S. or Thai law governed the alleged oral agreement between Ron Petcha and Nuphan, the Court concluded that Plaintiff had not demonstrated a likelihood of success on the merits, and the Motion for Preliminary Injunction was denied. (*See* Order of July 27, 2009.) If Plaintiff had brought 17 U.S.C. § 204(a) to the attention of the Court, the Motion for Preliminary Injunction would have likely been granted by the Court.

**6.** 17 U.S.C. § 204(a) states: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."

("A writing evidencing the transfer of copyright ownership need not be lengthy or detailed, but it must evidence the transfer with reasonable clarity.").

Indeed, § 204(a) "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price." *Effects*, 908 F.2d at 557; *see Konigsberg Int'l, Inc.*, 16 F.3d at 357. Moreover, " § 204(a)'s writing requirement not only protects authors from fraudulent claims, but also enhances predictability and certainty of ownership—Congress's paramount goal when it revised the Act in 1976." *Id.* (internal citations omitted); *see also Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir.1992) (holding that [17 U.S.C.] § 101's requirements of a written statement for copyright ownership of works for hire "is not merely a statute of frauds"; it is also intended "to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable").

### 2. *Implied Copyright Licenses*

■ "The Copyright Act defines transfer of copyright ownership to include exclusive licenses, but it *expressly excludes non-exclusive licenses* from the definition." *Weinstein*, 664 F.Supp.2d at 344 (emphasis added) (internal citation omitted). "This conclusion is not contained in the language of the statute. Instead, it is inferred from the fact that a non-exclusive license is not an ownership interest and because § 204(a) applies to the transfer of 'ownership,' the nonexclusive license is beyond its purview." *Pamfiloff v. Giant Records, Inc.*, 794 F.Supp. 933, 937 (N.D.Cal.1992). Consequently, non-exclusive licenses "may be granted orally, or may even be implied from conduct." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 10.03[A],

10–36 (2006). Specifically, in granting a non-exclusive license, a copyright owner gives up only one stick from the bundle of rights that comprises copyright ownership. *Effects*, 908 F.2d at 558.

■ Implied non-exclusive licenses are generally "found only in narrow circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it." *Weinstein*, 664 F.Supp.2d at 344 (internal citations omitted); *see Smith-Kline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d Cir.2000); *see also SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 317 (S.D.N.Y.2000) ("An implied [non-exclusive] license can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose."); *see also I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir.1996) (drawing on *Effects*, the Seventh Circuit applies a three-part test: an implied non-exclusive license arises when: (1) a person (the licensee) requests the creation of a work; (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it; and (3) the licensor intends that the licensee-requestor copy and distribute his work).

Therefore, courts, find that a copyright owner has granted an implied non-exclusive license in only limited circumstances, thereby "follow[ing] the *Effects* test...." *Weinstein*, 664 F.Supp.2d at 345. In *Lulirama, Ltd. v. Axcess Broad. Servs., Inc.*, the Fifth Circuit found an implied non-exclusive license where the writer-plaintiff created an advertising jingle for the defendant to sell to other parties. *Lulirama, Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872 (5th Cir.1997). Similarly, in *Jacob Maxwell, Inc. v. Veeck*, the Eleventh Circuit found an implied non-exclusive license

where a composer created a song at the request of the defendant, a minor league baseball team, and with the intention that the defendant would play it at games. *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749 (11th Cir.1997); *see also I.A.E., Inc.,* 74 F.3d 768.

Thus, "[a]lthough ... courts have held that an (invalid) oral agreement contemplating an exclusive license can nevertheless be enforced as a non-exclusive license, the licensees in those cases satisfied the conditions necessary for a non-exclusive license—that the work at issue was created at the licensee's request and with the intention that the licensee copy and distribute it." *Weinstein,* 664 F.Supp.2d at 345; *see Lulirama Ltd.,* 128 F.3d at 879–81. Otherwise, implying non-exclusive licenses beyond the bounds of *Effects* "would undermine copyright owners' statutory rights by turning every failed negotiation for an exclusive license into a potential claim for a non-exclusive license." *Weinstein,* 664 F.Supp.2d at 345, n. 9.

Here, Defendants cite *Textile Productions v. Mead Corp.,* which held that "in determining whether a party holds ... exclusionary rights [the Court must] determine the substance of the rights conferred on that party, not ... the characterization of those rights as exclusive licenses or otherwise." *Textile Prods. v. Mead Corp.,* 134 F.3d 1481, 1484 (Fed.Cir.1998); Defs.' Opp'n 5. The court concluded that "[t]he use of the word 'exclusive' is not controlling; what matters is the substance of the arrangement." *Id.* To that end, the court noted:

> [A]n exclusive license is a license to practice the invention ... accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licen-

see is given leave.... Thus, if a patentee-licensor is free to grant licenses to others, licensees under that patent are not exclusive licensees.

*Id.*

However, Defendants' reliance on *Textile Productions* is, at best, misplaced. First, *Textile Productions* pertains to the issue of standing in patent licensing cases, which is necessarily different than the issue of licensing copyrights. *Id.* Second, all of the cases that cite to, or rely upon *Textile Productions,* also pertain to the licensing of patents, only. Indeed, *Textile Productions* has not been applied to the licensing of copyrights. *See Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.,* 361 F.Supp.2d 1244 (E.D.Wash.2004); *see Alcatel USA, Inc. v. Orckit Comm.,* 2000 WL 502846, *3 (N.D.Cal. Apr. 13, 2000); *see Biagro W. Sales, Inc. v. Helena Chem. Co.,* 160 F.Supp.2d 1136, (E.D.Cal. 2001); *see Mission I–Tech Hockey Ltd. v. Oakley, Inc.,* 394 F.Supp.2d 1270 (S.D.Cal. 2005); *see EOS GMBH Electro Optical Sys. v. DTM Corp.,* 2002 WL 34536679, *4 (C.D.Cal. Feb. 6, 2002). Thus, as *Textile Productions* pertains to the licensing of patents, and Defendants have failed to establish why it should otherwise apply to the licensing of copyrights, the Court declines to apply *Textile Productions* to the alleged license agreement at issue.

Defendants also suggest that pursuant to *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.,* whether a licensor intends to grant an exclusive or non-exclusive license, "is a question of fact that must be left to the jury."[7] *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.,* 2008 WL 3200212 at *6 (N.D.Cal. Aug. 6, 2008). Defendants' reliance is disingenuous because the language cited is not the court's

---

7. At the hearing, the Court admonished counsel for Defendants for citing case authority not supportive of his claim.

conclusion or holding, but rather, only a portion of one of the parties' arguments, paraphrased by the court. *Id.* In pertinent part, *Intelligraphics, Inc.* states:

> Finally, Intelligraphics argues that to the extent the language of the [agreement] might be found to be ambiguous as to whether an implied license was created, the existence of an implied license depends on the intent of the parties, which is a question of fact that must be left to the jury.

*Id.* The language relied upon by Defendants is nothing more than one party's argument, and so is insufficient. *Id.* Indeed, Defendants do not cite other case law to support their proposition, or even cite to other language in *Intelligraphics, Inc.* that represents the court's actual conclusion or holding. (Defs.' Opp'n 5–6.)

Defendants further contend without citation to any authority, that because they bargained for "exclusive rights to BBTV's programming in the [U.S.] and Canada," as well as for "non-exclusive rights in Europe," said terms that represent the Bundle Agreement, "cannot be separated, segregated or otherwise chopped up." (Defs.' Opp'n 6; Defs.' SOF ¶ 12; Defs.' Addt'l SOF ¶ 16.) According to Defendants, because the offer of "$45,000 per month was for all three of those rights as a whole," not just the exclusive rights to programming in the U.S. or Canada, or the non-exclusive rights to programming in Europe, an implied non-exclusive license was created and Defendants are consequently not required to comply with § 204(a)'s writing requirement. (Defs.' Opp'n 6, 8; Defs.' SOF ¶ 12; Defs.' Addt'l SOF ¶ 16.)

In any event, it is clear that Defendants have unlawfully infringed the copyrights at issue. First, pursuant to § 204(a), because there is no writing, Defendants cannot argue the existence of an exclusive transfer of ownership of the copyrighted programs at issue. (JSUF ¶ 18; *see* 17 U.S.C. § 204(a)). Second, Defendants cannot argue the existence of an implied non-exclusive license because implied non-exclusive licenses exist only in narrow circumstances where one party has expressly created a work at the other's request and handed it over, intending for the other to copy and distribute it. *Weinstein,* 664 F.Supp.2d at 344. However, because Plaintiff did not deliver the copyrighted programs at issue to Defendants, the alleged agreement cannot be construed as an implied non-exclusive license, and so does not fit within that narrow set of circumstances. *Id.* Finally, Defendants' argument that the Bundle Agreement permits circumvention of § 204(a)'s writing requirement also fails. (Defs.' SOF ¶ 12.)

Aside from the fact that the authority upon which Defendants rely is wholly unpersuasive, *Konigsberg Int'l, Inc.* directly addressed whether "joint creative endeavors," like the Bundle Agreement, displace § 204(a)'s writing requirement, and held in the negative. *Konigsberg Int'l, Inc.,* 16 F.3d at 357. In reaching its decision, the Ninth Circuit stated:

> It is a far different matter to say one can dispense with the written instrument requirement altogether by claiming an oral partnership or joint venture. Given the ease with which joint ventures may be alleged and proved under the law of many states, acceptance of this argument would fatally undermine the Copyright Act's written instrument requirement ... In sum, [the defendants] did lunch, not contracts. That didn't satisfy [§ ] 204 in *Effects* ..., and it fares no better here.

*Id.* at 358. Indeed, even if the rights to BBTV's programming in the U.S. and Canada were part of a broader oral agreement, § 204(a)'s writing requirement cannot suddenly be circumvented. Again, *Konigsberg Int'l, Inc.* emphasized the im-

portance of § 204(a)'s writing requirement:

> [T]he writing ... ensure[s] that the author will not give away his copyright inadvertently and *forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price* ... a transfer of copyright is simply 'not valid' without a writing.

*Konigsberg Int'l, Inc.*, 16 F.3d at 357 (emphasis added) (internal citations omitted). Thus, § 204(a) is strictly construed to mean that a writing must accompany every exclusive license agreement. *See Radio Television Espanola S.A.*, 183 F.3d at 929. As such, if it is exclusive, it is irrelevant whether the U.S. and Canada license agreement was otherwise part of a broader agreement, the alleged Bundle Agreement cannot circumvent § 204(a)'s writing requirement.

Furthermore, § 204(a)'s writing requirement, which serves several important purposes, would be undermined if the Bundle Agreement displaces it. Principally, the 1976 revisions to the Copyright Act were intended to protect copyright owners from fraudulent claims and enhance predictability and certainty of ownership. *See Konigsberg Int'l, Inc.*, 16 F.3d at 357; *see Effects*, 908 F.2d at 557 ("Most importantly, [§ ] 204 enhances predictability and certainty of copyright ownership 'Congress' paramount goal' when it revised the Act in 1976."). Thus, because Defendants' argument that an exclusive license within a broader oral agreement should circumvent § 204(a)'s writing requirement puts copyright owners at greater risk of fraudulent claims and reduces certainty of ownership, it necessarily flies in the face of the Copyright Act and its intended goals. Indeed, interpreting the alleged U.S. and Canada agreement as being able to circumvent § 204(a) is wholly inconsistent with the Copyright Act.

Accordingly, Plaintiff's Motion is **GRANTED IN PART** to the extent that it seeks partial summary adjudication as to its copyright infringement claim. The Court now turns to whether Ron Petcha and IPTV are liable for said copyright infringement.

### C. Liability for Copyright Infringement as to IPTV and Ron Petcha

Under Ninth Circuit precedent, "a corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *The Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir.1996) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir.1985)); *Transgo, Inc.*, 768 F.2d at 1021 (internal citations and quotations omitted). The Ninth Circuit has also noted that "[c]ases which have found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct, ... or the 'central figure' in the challenged corporate activity." *Davis*, 885 F.2d at 524 n. 10 (internal citations omitted); *Wolf Designs, Inc.*, 322 F.Supp.2d at 1072 (citing *Davis*, 885 F.2d at 524; *LeDuc v. Ky. Cent. Life Ins. Co.*, 814 F.Supp. 820 (N.D.Cal.1992)).

■ Courts have also applied this basic principle to trademark infringement, *The Comm. for Idaho's High Desert*, 92 F.3d at 823–24 (internal citations omitted), unfair competition, *The Comm. for Idaho's High Desert*, 92 F.3d at 823–24 (internal citations omitted); *Transgo, Inc.*, 768 F.2d at 1021, copyright infringement, *see Novell, Inc. v. Unicom Sales, Inc., et al.*, No. C–03–2785 MMC, 2004 WL 1839117, at *17 (N.D.Cal. Aug. 17, 2004) (internal citations omitted), and contributory infringement

claims, *see MDY Indus., LLC v. Blizzard Entm't, Inc.,* 616 F.Supp.2d 958, 972–73 (D.Ariz.2009). Similarly, an individual "owner or officer of a corporation" may be held personally liable for a corporation's violation of California Business and Professions Code §§ 17200, *et seq.* if "he or she actively and directly participates in the unfair business practice...." *Bradstreet v. Wong,* 161 Cal.App.4th 1440, 75 Cal. Rptr.3d 253, 258, 268 (Cal.Ct.App.2008).

■■ IPTV admits that it "reproduced, distributed, publicly performed and/or publicly displayed BBTV's programs." (JSUF ¶ 22.) Thus, because IPTV cannot show the existence of an agreement, IPTV exploited at least one exclusive right granted to Plaintiff as an owner of the copyrighted programs at issue under 17 U.S.C. § 106, and so is liable for copyright infringement. *See Perfect 10, Inc.,* 487 F.3d at 715; *see* 17 U.S.C. § 106; *see generally* Defs.' Opp'n.

■■ Plaintiff contends that as Ron Petcha is and has been the CEO of IPTV since its founding, he is also liable for IPTV's copyright infringement. (Pl.'s Mot. 11; Pl.'s SOF ¶ 5.) Plaintiff argues that Ron Petcha "personally hired every one of IPTV's employees and chose its name, personally selects IPTV's programming, and personally arranges for distribution agreements, including how much to pay." (Pl.'s Mot. 11.) Plaintiff correctly alleges that "[Ron] Petcha admits that he personally negotiated with BBTV over the renewal of a license agreement in mid–2008, and received BBTV's telephone calls and correspondence setting forth BBTV's view that no license agreement existed permitting IPTV to use BBTV's copyrighted works." (Pl.'s Mot. 11.) Certainly, because Ron Petcha is a "guiding spirit" behind IPTV's activities, including IPTV's alleged copyright infringement, the uncontroverted evidence establishes that he is liable for copyright infringement. *See*

*Davis,* 885 F.2d at 524 n. 10; *see also The Comm. for Idaho's High Desert, Inc. v. Yost,* 92 F.3d 814, 823. In any event, Defendants' Opposition does not argue otherwise. (*See generally* Defs.' Opp'n.)

Accordingly, as IPTV and Ron Petcha are both liable for copyright infringement of the copyrights at issue, Plaintiff's Motion is **GRANTED IN PART** to the extent that it seeks to find said Defendants liable for copyright infringement.

### D. *Defendants' Affirmative Defenses*
#### 1. *Equitable Estoppel*

■■ "A plaintiff is estopped from asserting a copyright claim if he has aided the defendant in infringing or otherwise induced [the defendant] to infringe or has committed covert acts such as holding out ... by silence or inaction." *Field v. Google, Inc.,* 412 F.Supp.2d 1106, 1116 (D.Nev. 2006). Thus, to prevail on an estoppel defense, the following four elements must be established: (1) the plaintiff knew of the defendant's allegedly infringing conduct; (2) the plaintiff intended that the defendant rely upon his conduct or act so that the defendant has a right to believe it is so intended; (3) the defendant is ignorant of the true facts; and (4) the defendant detrimentally relied upon the plaintiff's conduct. *Id.; see Carson v. Dynegy, Inc.,* 344 F.3d 446, 453 (5th Cir.2003) (citing 4 Nimmer § 13.07 (2002)); *see also Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.1960). Though, "[e]quitable estoppel is disfavored and should only be applied as needed to avoid injustice." *Taita Chem. Co. v. Westlake Styrene Corp.,* 246 F.3d 377, 389 (5th Cir. 2001); *see also Richardson v. U.S.,* 60 U.S. 263, 267, 19 How. 263, 15 L.Ed. 639 (1856) ("[E]stoppels, which preclude the party from showing the truth, are not favored.").

■■ Here, Defendants assert that equitable estoppel applies because "BBTV

made its copyrighted works available to IPTV and never did anything to stop IPTV from distributing the programs." (Defs.' Opp'n 13.) Specifically, Defendants contend that Plaintiff permitted IPTV to "make an electronic copy of [Plaintiff's programs once they aired in Thailand] and transmit [them] to its office in Los Angeles, California to be used in making a master copy and copies thereof for distribution...." (Defs.' Opp'n 13–14.) Thus, Defendants allege that "[f]rom approximately August 1, 2008[to] July 21, 2009, IPTV sold and distributed BBTV's programs 'exactly as they [were] first telecast on Channel 7 in Thailand without alteration.... Indeed, BBTV never even sent IPTV a cease and desist letter; instead opting to have no contract with IPTV." (Defs.' Opp'n 14.) As Plaintiff correctly notes, however, it did not create any works for IPTV, or otherwise facilitate the alleged infringement. (Pl.'s Reply 3.) Rather, the uncontroverted evidence establishes that IPTV "copied BBTV's over-the-air broadcasts." (Pl.'s Reply 3.) The mere act of broadcasting television programs over-the-air, though, does not amount to knowledge or permission to copy or distribute. Furthermore, the evidence establishes that Plaintiff sent multiple notices indicating that it objected to Defendants' copying and/or distribution of its copyrighted programs at issue. (Pl.'s Reply 4; JSUF ¶¶ 14–16.)

Accordingly, for the reasons stated, but mostly because the mere broadcast of programs over-the-air did not amount to Plaintiff's permission or knowledge of Defendants' allegedly infringing conduct, Defendants' equitable estoppel defense fails.

### 2. Laches

■■■ "Laches is an equitable time limitation on a party's right to bring suit." *Kling v. Hallmark Cards, Inc.,* 225 F.3d 1030, 1036 (9th Cir.2000). "To demonstrate laches, a party must establish[:] (1)

lack of diligence by the party against whom the defense is asserted[;] and (2) prejudice to the party asserting the defense." *Apache Survival Coalition v. U.S.,* 21 F.3d 895, 905 (9th Cir.1994). Specifically, "a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Kling,* 225 F.3d at 1032. "[T]he period of delay for laches for copyright infringement claims runs only from the time that the plaintiff knew or should have known about an actual or impending infringement, not an adverse claim of ownership." *Id.* at 1036; *see Entous v. Viacom Intern., Inc.,* 151 F.Supp.2d 1150, 1155 (C.D.Cal.2001) (citing *Roley v. New World Pictures, Ltd.,* 19 F.3d 479, 481 (9th Cir.1994)) ("Under federal copyright law, a cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge."); *see also McIntosh v. N. Cal. Univ. Enter. Co.,* 670 F.Supp.2d 1069, 1100 (E.D.Cal.2009).

■■■ Here, Defendants contend that "BBTV slept on its purported right—for ten months—and caused prejudice to IPTV." (Defs.' Opp'n 15.) However, Defendants fail to show that ten months is an unreasonable delay. *See Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 942 (7th Cir. 1989) ("A two year delay in filing an action following knowledge of the infringement has rarely been held sufficient to constitute laches."); *see also* 3–12 M. Nimmer & D. Nimmer, *Nimmer on Copyrights,* § 12.06(B)(2), at 12–149 (2006).

Accordingly, because ten months is not an unreasonable delay, Defendants' laches defense fails.

### 3. Unclean Hands

■■■ "[H]e who comes into equity must come with clean hands. This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted

with inequitableness or bad faith relative to the matter in which he seeks, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (9th Cir.1945). "Under this doctrine, plaintiffs seeking equitable relief must have acted fairly and without fraud or deceit as to the controversy in issue." *Intamin, Ltd. v. Magnetar Tech. Corp.,* 623 F.Supp.2d 1055, 1074 (C.D.Cal.2009) (citing *Adler v. Fed. Republic of Nigeria,* 219 F.3d 869, 877 (9th Cir.2000)). Consequently, "[t]his maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant." *Id.* at 815, 65 S.Ct. 993; *see Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014, 1021 (7th Cir.2002) (holding that unclean hands "means that in equity as in law[,] the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to.").

 Here, Defendants contend that Plaintiff exercised bad faith when "[it] continued to provide IPTV access to its copyrighted works and said nothing while IPTV continued to distribute the programs." (Defs.' Opp'n 16.) However, for the same reasons that Defendants' equitable estoppel defense fails, so too, does this defense. Specifically, Plaintiff's broadcast of programs over-the-air did not amount to permission or knowledge of Defendants' copying and distribution of Plaintiff's copyrighted programs at issue.

Accordingly, because the mere broadcast of programs on television did not constitute bad faith on Plaintiff's part, Defendants' unclean hands defense fails.

### E. *Defendants' Counterclaims*

Defendants' counterclaims rest on the assumption that a valid license agreement existed between the parties. (Defs.' Opp'n 17.) However, because the evidence es-

tablished that no valid license agreement was created, Plaintiff's Motion is **GRANTED IN PART** to the extent that Defendants' counterclaims are deemed moot.

### F. *Third–Party Liability of Tip Petcha, Wongchaiwat, and BKT*

Defendants contend that because Plaintiff's FAC does not allege that Tip Petcha or Wongchaiwat have directly infringed, they are at most, secondarily liable for any alleged infringement, and so, subject to only third-party liability. (Defs.' Mot. 4, 13.) Similarly, Defendants claim that BKT is not liable for any alleged infringement because BKT "does not conduct any business." (Defs.' Mot. 6.)

#### 1. *Contributory and Inducement Copyright Infringement*

 "Although the Copyright Act does not expressly impose liability on anyone other than direct infringers, courts have recognized that in certain circumstances, vicarious or contributory liability will be imposed." *Adobe Sys., Inc. v. Canus Prods., Inc.,* 173 F.Supp.2d 1044, 1048 (C.D.Cal.2001). "Liability for contributory copyright infringement attaches when one who, with knowledge of the infringing activity, causes or materially contributes to the infringing conduct of another." *Perfect 10, Inc. v. Cybernet Ventures, Inc.* ("*Cybernet Ventures*"), 213 F.Supp.2d 1146, 1169 (C.D.Cal.2002) (citing *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1019 (9th Cir.2001)); *see Religious Tech. Center v. Netcom On–Line Comm., Servs.,* 907 F.Supp. 1361, 1373 (N.D.Cal. 1995) (holding that "liability for participation in the infringement will be established where the defendant with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another"). Contributory liability for copyright infringement, therefore, requires showing that "the de-

fendant had reasonable knowledge of specific infringing [acts]." *See Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.* ("*MGM, Inc.*"), 380 F.3d 1154, 1160 (9th Cir.2004) (citing *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1022 (9th Cir.2001)); *see Adobe Sys., Inc.,* 173 F.Supp.2d at 1048 ("Contributory infringement requires that the secondary infringer know or have reason to know of direct infringement."). "The standard for the knowledge requirement is objective, and is satisfied where the defendant knows or has reason to know of the infringing activity." *Cybernet Ventures, Inc.,* 213 F.Supp.2d at 1169.

■■■ Inducement of infringement requires "active steps ... taken to encourage direct infringement." *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster, Ltd.*"), 545 U.S. 913, 936, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005); *see UMG Recordings, Inc. v. Veoh Networks, Inc.,* 2009 WL 334022 (C.D.Cal. Feb. 2, 2009) ("Inducement to infringe requires distribution of a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement."); see *MGM, Inc.,* 380 F.3d at 1160 (citing *A & M Records, Inc.,* 239 F.3d at 1022). Thus, courts generally find liability for inducement where one "actively and knowingly aid[s] and abet[s] another's direct infringement." *Id.* (internal citations omitted). However, the Supreme Court noted that it must be "mindful of the need to keep from entrenching on regular commerce or discouraging the development of technologies," and stated:

> [M]ere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in

themselves. The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus, does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.

*Id.* at 937, 125 S.Ct. 2764.

### 2. Secondary Liability for Trademark Infringement

■■■ "The two elements for contributory trademark infringement are[:] ... (1) supply of a product[;] and (2) knowledge of the direct infringement." *Fonovisa, Inc. v. Cherry Auction, Inc.,* 847 F.Supp. 1492, 1498 (E.D.Cal.1994). "Vicarious liability for trademark infringement requires a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Perfect 10, Inc. v. Visa Int'l* ("*Visa Int'l*"), 494 F.3d 788, 807 (9th Cir.2007) (internal citations omitted); *see Fonovisa, Inc.,* 847 F.Supp. at 1499. Finally, "secondary liability for trademark infringement should be more narrowly drawn than secondary liability for copyright infringement." *Id.* at 1497 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)).

### a. Liability of Tip Petcha

The parties vigorously dispute whether Tip Petcha is liable for any of the alleged infringement, either directly or secondarily. (*See generally* Pl.'s SOF in Opp'n.) Defendants argue that Tip Petcha's involvement with IPTV has "always been primarily limited to a portion of IPTV's business that operates a shopping channel," and so her involvement with IPTV is minimal. (Defs.' Mot. 5.) Defendants state that Tip Petcha "does not, and did not,

have any involvement with IPTV's sale, distribution and copying of programming," such that she was not "involved at all with any of the license negotiations." (Defs.' Mot. 5.)

By contrast, Plaintiff contends that although Tip Petcha, "the admitted owner of IPTV," has "claimed to have only worked 50% of the time in 2008 at IPTV, ... IPTV's tax returns [actually] show her working 100% of the time that year...." (Pl.'s Opp'n to Defs.' Mot. for Summ. J. or, in the Alternative, Partial Summ. J. ("Pl.'s Opp'n") 8; Pl.'s SOF in Opp'n ¶¶ 22–29, Ex. 10, pp. 161–67, 173.) Furthermore, although she claims she has only assisted with IPTV's shopping selections, Plaintiff alleges that "IPTV's filings with the California Secretary of State show that [Tip] Petcha [has occupied] all major positions at IPTV, including Chief Executive Officer, Chief Financial Officer, and Secretary." (Pl.'s Opp'n 8; Pl.'s SOF in Opp'n Ex. 12, p. 176.) Finally, Plaintiff argues that Tip Petcha knew or had reason to know of IPTV's infringement. (Pl.'s Opp'n 8; Pl.'s SOF in Opp'n ¶¶ 22–29.)

 Accordingly, because issues of material fact remain as to Tip Petcha's involvement with IPTV, and so too, her liability with regards to Plaintiff's copyright and/or trademark infringement claims, Defendants' Motion is **DENIED** to the extent it seeks to dismiss Tip Petcha as a Defendant.

### b. *Liability of Wongchaiwat*

The parties also vigorously dispute whether Wongchaiwat is liable for any of the alleged infringement, either directly or secondarily. (Pl.'s SOF in Opp'n ¶¶ 30–

38.) Principally, Defendants contend that Wongchaiwat:

did not personally sell, distribute or copy any of BBTV's programs at issue in this lawsuit, ... did not and was not involved with the selection of IPTV's programming, nor the acquisition of licensing agreements, .... [and] does not authorize or direct IPTV's or BKT's activities relating to the selection of programming and copyrights.

(Defs.' Mot. 5.) Thus, Defendants contend that although Wongchaiwat is employed by IPTV and partly-owns BKT, "[h]is work at IPTV is primarily limited to sales and marketing," and so, he "did not know of IPTV's alleged infringing activity, and had no reason to know of it." (Defs.' Mot. 5.)

By contrast, Plaintiff contends that Wongchaiwat has "admitted title and duties as sale director of IPTV, so that there "is sufficient evidence ... that [he] materially participated in IPTV's copyright infringement." [8] (Pl.'s Opp'n 10; Pl.'s SOF in Opp'n ¶¶ 36–38, Exs. 1, p. 25, 3, p. 57.) Furthermore, Plaintiff argues that Wongchaiwat's own assistant, June, "sent and received communications [with] BBTV, including communications that would clearly have placed Wongchaiwat on notice of BBTV's position." (Pl.'s Opp'n 10; Pl.'s SOF in Opp'n Exs. 4, p. 77, 5, p. 87.)

 Accordingly, because issues of material fact remain as to Wongchaiwat's involvement with IPTV, and so too, his liability with regards to Plaintiff's copyright and/or trademark infringement claims, Defendants' Motion is **DENIED** to the extent it seeks to dismiss Wongchaiwat as a Defendant.

---

**8.** Wongchaiwat states the following: In 2002, I opened BKT Entertainment Shop in Hollywood, to be a center of CDs, video CDs, karaoke and videos for rent, as well as books.... IPTV commenced its operations on 5 April 2004, with the objective to upgrade the standards of Thai drama series to those of foreign drama series. A copyright system was introduced." (Pl.'s Opp'n, Ex. 1, p. 25.)

### c. *Liability of BKT*

Finally, the parties dispute whether BKT is liable for infringement. (Pl.'s SOF in Opp'n ¶¶ 39–42.) As a general rule, a "parent corporation ... is not liable for the acts of its subsidiaries." *United States v. Bestfoods ("Bestfoods")*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (internal citations omitted). "Only in unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary." *E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, No. CV F 03–5412 AWI LJO, 2008 WL 2220396, at *5 (E.D.Cal. May 27, 2008) (internal citation omitted). "Among the 'unusual circumstances' where law will hold a parent corporation liable for the acts of a subsidiary are: (1) where the circumstances of the organization of the two entities are such that the corporate form should be disregarded (often referred to as 'alter ego' liability); (2) where the subsidiary acts as an agent of the parent corporation; and (3) where the parent corporation aids, abets or ratifies the acts of the subsidiary corporation." *Id.* (internal citation omitted).

Principally, Defendants contend that BKT "does not conduct any business ... is not the parent company [or] ... controlling entity of IPTV, ... has no profits, sales[,][or] revenue," and consequently, "has never distributed or copied any of BBTV's programming." (Defs.' Mot. 6.) Plaintiff on the other hand, argues that BKT is the parent company of IPTV and does business, and cites to BKT's website, which allegedly includes the following language: "Current annual sales are approximately over 10 million dollars (400–500 million baht). Projected growth sales rate is at a minimum 15% pre annum for the next two years." (Pl.'s SOF in Opp'n ¶ 39, Ex. 9, pp. 156–58.) Furthermore, Plaintiff alleges that "when potential customers contacted IPTV to purchase BBTV's copyrighted works, the response came from a person who gave the impression of being a BKT employee." (Pl.'s Opp'n 5.) Additionally, Plaintiff argues that "all license negotiations via e[-]mail between [Ron] Petcha and BBTV did not go to any IPTV e[-]mail address, but rather to a BKT ... e[-]mail address." (Pl's Opp'n 7; Pl.'s SOF in Opp'n Ex. 5, pp. 92–97.) Finally, Plaintiff states that "Tip Petcha formed IPTV at the behest of Ron Petcha and Wongchaiwat, the 50–50 partners of BKT." (Pl.'s Opp'n 7.) Thus, it appears that Plaintiff has provided evidence tending to show that BKT may be liable for the acts of its subsidiary, IPTV. *See Bestfoods*, 524 U.S. at 61, 118 S.Ct. 1876.

In response, Defendants argue that "[Plaintiff has not presented any evidence proving a direct connection between BKT and the infringement—as opposed to an alleged relationship with IPTV." (Defs.' Reply 4.) Specifically, Defendants contend that the only evidence in support of BKT's apparent liability includes certain web printouts, but which are inadmissable because "BBTV cannot authenticate them with testimony from any[one] with personal knowledge of the website's contends or ... accuracy." (Defs.' Reply 4; *see generally* Decl. of Ron Petcha in Supp. of Defs.' Reply Brief and Evidentiary Objections.)

Defendants' claims are potentially meritorious, as this Court previously stated in its Order of July 27, 2009. (*See* Order of July 27, 2009.) Specifically, a parent corporation, like BKT, is liable for the acts of its subsidiary, in only "unusual circumstances." *See Bestfoods*, 524 U.S. at 61, 118 S.Ct. 1876. However, the Court concludes that Plaintiff should have the opportunity to demonstrate otherwise. Accordingly, drawing all inferences in favor of Plaintiff as this Court must, the Court concludes that triable issues of ma-

terial fact remain as to Plaintiff's claims against BKT. Accordingly, because issues of material fact remain as to BKT's potential involvement with IPTV, and so too, its liability with regards to Plaintiff's copyright and/or trademark infringement claims, Defendants' Motion is **DENIED** to the extent it seeks to dismiss BKT as a Defendant.

### G. State Law Claim: Section § 17200 of the Business and Professions Code

 "Section § 17200 of the Business and Professions Code [§ 17200] broadly defines 'unfair competition' as inter alia, any 'unlawful, unfair, or fraudulent business practice....'" *Farmers Ins. Exchange v. Super. Ct.*, 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730 (1992). " '[U]nlawful business activity' proscribed under § 17200 includes 'anything that can properly be called a business practice and that at the same time it is forbidden by law.' " *Id.* (internal citations omitted.) As such, § 17200 is intended "to redress an unlawful business practice[,] 'borrows' violations of other laws[,] and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under § [§ ] 17200, *et seq.* and subject to the distinct remedies provided thereunder." *Id.; see Krantz v. BT Visual Images, L.L.C.,* 89 Cal.App.4th 164, 107 Cal.Rptr.2d 209 (Cal.Ct.App.2001) (holding that "relief under [§ 17200] stand[s] or fall[s] depending on the fate of the antecedent substantive causes of action.").

Here, Defendants argue that "because the infringement claims should be dismissed due to the oral license agreement, [Plaintiff's § 17200 claim] fails as a matter of law." (Defs.' Mot. 22.) However, said claims are not dismissed. Accordingly, because the antecedent substantive claims against Defendants remain, Plaintiff's § 17200 claim also remains, and Defen-

dants' Motion is **DENIED** to the extent that it seeks to dismiss Plaintiff's § 17200 claim.

### III. RULING

For the foregoing reasons, Plaintiff's Motion is **GRANTED** and Defendants' Motion is **DENIED**. The parties are ordered to re-file all pretrial documents consistent with this Order. The parties have been informed that this matter has been transferred to the Honorable William D. Keller for all purposes including trial. Counsel and the parties are placed on one hour call. Counsel must report to Judge Keller's courtroom on **MONDAY MAY 17, 2010** within one hour after being notified by his clerk. Counsel is informed that trial will start as scheduled on **TUESDAY MAY 18, 2010.**

IT IS SO ORDERED.